May it please the court, Holly Sullivan on behalf of Mr. Flores-Acuna. Tell me about the California license. How the bill of sale reflected a license plate that hadn't been issued yet. How the bill of sale affected the license plate? Didn't it refer to it? Yes, so in the cross-examination of Mr. Flores-Acuna, the government cross-examined him on a written document that I believe was actually a Mexican bill of sale document. It was in Spanish. And the cross-examination was if his signature was the signature that was on the bill of sale. And that the license plate on the bill of sale was a license plate that had been issued in California after the date of the signature and date on the bill of sale. So the government argued that it was a fraudulent document that Mr. Flores-Acuna or others created in order to provide him a defense at trial. I understand that. Why wasn't it fraudulent? I'm not arguing that it wasn't fraudulent. The issue is that Mr. Flores-Acuna did not have the intellectual capacity to create that document. And his attorney in one of the declarations that his attorney filed, his trial attorney, said that he was surprised that he said that that was his signature on the document. And that that was the document that he had signed. Because it was clear in just a comparison of signatures that he didn't sign it. And that wasn't his document. So he had testified and the attorney argued during opening statement and I believe also during closing statement that he did in fact sign various documents. That he signed insurance documents and that he signed some type of written agreement for the sale of the truck between this neighbor seller and Mr. Flores-Acuna. But that that wasn't the document or he believed that he would testify that wasn't the document. Because it was clear to everyone that it wasn't the document. Yet at the time of trial during cross-examination. So when you say it's clear to everyone it wasn't the document, the signatures didn't match, is that right? Correct. And the government argued in closing argument that it was obvious. It was obvious to the jury just in comparing his signatures on the stipulation that was submitted at trial. That the substance that was found in the truck was methamphetamine and I believe the quantity as well of methamphetamine. That the signatures didn't look at all alike. And so in matching known signatures from him to the signature on this document it was clear that he hadn't signed that document. Where did the government get that document from? You know that I'm actually, I don't know that. That's not in the record so I'm not entirely sure where the document, I'm sure government counsel can speak to that. I do know that at the time that likely from the DMV or possibly from the import office in Otay Mesa. But the government is the one that introduced that, it wasn't your client? Correct, the government on cross-examination of Mr. Flores Acuna introduced that document. But I thought though that, I can't remember if you were trial counsel or not. I was trial counsel. The government counsel though said something like well I have the original here as though. He did. So there wasn't any dispute then as to the authenticity of that document at trial? I mean you're conceding now it was fraudulent but it sounded like your client's lawyer at the time was attesting to its authenticity. I don't believe he was attesting to its authenticity. At the time that the document that Mr. Flores Acuna was cross-examined with was a copy of this document. That I assume was turned over in discovery which is why defense counsel had it. I don't know, I can't answer that question as to who first got the document. But then at the time that the government attempted to put the document into evidence, defense counsel said I have the original here. And at that point then they went up to sidebar and the government spoke about how they believed that the document was fraudulent. And then defense counsel said well then there's no way to be able to put it into evidence if it's a fraudulent document. So there was, I don't know who obtained that document to begin with. But I know at that point that the government attempted to enter it into evidence and did enter it into evidence that defense counsel had not put it into evidence. The jury decided what was going to happen with the next 14 years of his life without knowing that this man had severe deficits. That he had problems with all of the areas that were focused on in cross-examination. He had issues with his memory. He had issues with communication. That he would only be able to respond to questions and give answers when there had been repetition of questions. How would you draw the line as to when counsel had to have somebody examined? I may vary from district to district. It's tough. I agree that it's tough. But I would say when there is clear evidence of mental impairment, that is a time that you should have your client examined. Was here the issue of mental impairment or retardation or both? It was retardation. There is some back and forth in the government briefing where there is talk of he didn't have any type of mental health impairment. So a severe mental health issue. But those are two entirely different things. No one is arguing that he suffered from a thought disorder or he had hallucinations or delusions or anything of that nature. It's that he had a cognitive impairment that it sounds like he was born with that affected these areas of his life. He was a 28-year-old man who was married with three children who had never lived away from his family, away from his parents. How would the evidence that you say should have been introduced have helped him explain the cell phone with the call at 3 a.m.? If his family didn't even know he had that cell phone, it's hard for me to understand how this mental disability evidence would have gotten him out of the fact that there was this call on this cell phone that he had. Well, in the defense counsel's opening statement, he spoke about while he was in line that he received the call from this neighbor seller who was checking on essentially his plan for that day, where he was going, what time he was going to be at the junkyard, all of these things that happened. And then on cross-examination, when he asked Mr. – I'm sorry, on direct examination, when he asked Mr. Flores Acuna about it, he didn't remember having a call to his cell phone at all. The explanations for these areas are, one, it has been six months since the time, since the date that the incident happened that he's tested on. I'm not asking why he didn't remember. I'm asking if the theory was that he didn't have the mental capacity to really be carrying out any of this, so couldn't have known what was really happening. The cell phone evidence just seems very inconsistent with that. I don't quite understand how even on that theory that some of these things he might have been tricked or something, how you explain that he has this cell phone that his family doesn't know about and he's getting a call in the middle of the night, how you would have explained that away. The only thing I would note about the cell phone that I find at all, I guess, strange is his purchase of the cell phone, which he explained that. He explained that he works at a swap meet and sells items at a swap meet and that he purchased the cell phone at the swap meet so that he could use it as a radio when he was crossing the border and being able to contact his family in that way. And that makes sense to me in him being able to do that. Why can't you use a personal cell phone for that? There are difficulties in cell phone service of having cell phones that work in Mexico only, cell phones that work in the United States, and radio cell phones. What kind of cell phone did he have? He had two cell phones. Oh, no, no, no, not the Boost, but the cell phone. His personal cell phone was what kind? Was it a Mexican cell phone? Yes. My understanding is that that cell phone did not work in the United States, which is why there were times he would borrow his sister's cell phone to be able to communicate. It's possible if I could save my remaining minute. Sure. May it please the Court, Andrew Hayden on behalf of the United States. First, just to directly address Judge Watford and Judge Mott's question about the purchase agreement. I was trial counsel, and the purchase agreement showed up when the defense started their case, along with all the other photographs that had been taken in Mexico that came in as various defense exhibits. And the curious thing about that was Mr. Flores-Kunitz in the record was actually shown the agreement, and it was paraded around the courtroom, but then it wasn't offered. And that's why on SER pages 284 and 285, we had the certified DMV documents that had already been exchanged in discovery, and we were able to quickly look at it. And it was also, and it's not as clear in the record as I wish it had been, but the written stimulation about the drugs was signed by Mr. Flores-Kunitz in real time. So the jury watched him sign that document, and then they were able to look at the signature that was on the sales agreement that he claimed was his. And defense counsel from the trial now admits that they look nothing alike. He opened the case on the idea that his client had signed that document. So now in hindsight, he's saying he's shocked that he actually testified to that fact, but he showed him the agreement, he testified about it. The United States put it in as a government exhibit because it had already been seen by the jury, and we obviously saw its evidentiary value for impeachment now that the case was progressing. Is this the first case you've had where your effective cross-examination is used against you on appeal? No, Your Honor. I think that that's one of the challenges here is that, you know, the court asked what is the bright line rule, and I guess we're dangerously close to looking at what was extraordinarily, from the United States' perspective and shared by Judge Hayes, extraordinary pretrial diligence on the part of trial counsel with a very specific strategy, lots of witnesses, a very elaborate story, documents to support that story, and then when the lie is unable to be maintained, throw up their hands and say, actually turns out the defendant wasn't capable of maintaining those lies, which is an issue of credibility, not necessarily his intellectual capacity. Well, if he was mentally retarded enough, it would go to his capacity to have the requisite mens rea, right? Yes, Your Honor. And I think that that's one of the important distinctions here, and it's shared by Judge Hayes, is that Dr. Yanofsky's report is equivocal and qualified at best. It doesn't really say much, and it certainly can't establish the prejudice prong. We, of course, don't believe that Mr. Torres' conduct and performance in this case can be described as anything close to constitutionally deficient, but in regards to prejudice, the court asked a question about the cell phone. That's exactly right. Nothing that Dr. Yanofsky said can explain why Mr. Flores Acuna got up at 3.40 in the morning when most people are asleep, suddenly had a cell phone that none of his family's ever seen before, despite the fact that he apparently is so dependent upon them, lives with them, they have to program his cell phone. He's got this magical cell phone with the ID and everything on a slip of paper attached to it. He's in line at the port of entry. He's receiving calls on the magical, mysterious drug cell phone, as we referred to it, as he's in line at the port, and he crosses all the time. But this morning, on this morning, he's extraordinarily nervous, and it's so nervous it alerts the primary officers he's got drugs in the car and everything else. So there's nothing that Dr. Yanofsky can say, for example, about why he lied to the booth that he was going to do construction when he later tells Dr. Yanofsky he was going to pick up parts for his dad. Nothing that Dr. Yanofsky says or would potentially say can disrupt the case in chief, which is largely discarded by the defendant in this appeal. In regards to... Well, why did he get so much time? Was it a mandatory minimum? It was at the time, Your Honor, and I think we've seen at the risk of testifying outside the record, we've seen changes in the charging of the mandatory minimums, which I'm sure the court is aware of. But Mr. Flores-Acuna was not safety valve eligible because of his DUI, and he was on probation at the time of this trial. So it was a 120-month mandatory minimum, and he was not safety valve eligible going into the trial. And so he elected to pursue his trial options, and I think that the 14 years reflects Judge Hayes' perceptions of this witness. Obviously, the standard review is extraordinarily important, and this court's determination about the denial of the 2255 is de novo. But Judge Hayes, his factual findings are clear error, and his need to have an evidentiary hearing is abuse of discretion. And we're talking, unlike a 2254, we're talking about Judge Hayes who presided over the trial, watched the defendant sit through multiple days of the trial, interact with his counsel, testify from the stand, listen to the veracity of his statements, look at his demeanor and the way he testified, and he imposed a 14-year sentence. And he was aware of Dr. Yanofsky's report at the time he did that. And I think that that's instructive for the court, obviously not dispositive, when we perceive the lower court proceedings and what actually transpired here. In regards to where we draw the line here, Your Honor, I would just suggest that the uncontradicted facts in E.R., in Judge Hayes' order, there's 10 of them, and they establish a level of pretrial diligence that I think most defendants would be well-served to have received from their appointed counsel, and to move the bar and to move the standard to something else would be a disservice to both what's required under the Constitution and Mr. Torres' efforts. And unless there are further questions, the United States would submit. Thank you, counsel. Unless, Judge Watford, do you have anything else? No. Thank you, counsel. Thank you, Your Honor. So you have one minute left. Very briefly, just a few things. One, addressing the cell phone question, he testified that his wife was the one who had programmed his cell phone, so there was a family member that had the ability to do that or that was able to do that. But didn't the family testify that they didn't know about this other cell phone? The other family members, yes, his siblings, and I believe one brother-in-law or sister-in-law. But, yes, they testified that they had not seen that cell phone before. Second, I would note that to say that trial counsel did incredible diligence pre-trial is a crazy assertion to make to me. He said during his meetings, so it's a total of about nine hours in his entire pre-trial interaction with Mr. Flores Acuna over the course of six months, that during that time he noticed that Mr. Flores Acuna kept saying there was something wrong with his head and that he couldn't learn. That based on these interactions, he believed that he had a low IQ, but he didn't understand to what extent. These interactions caused him enough concern that he felt the need to call his sister and ask his sister if he had ever suffered any head trauma based on his interactions with him. To have those types of interactions and not look further to determine whether or not there was limitations that he would have before you put him on the stand in order to testify. Well, that's not the lawyer's decision whether he should take the stand. Correct, but it's his decision on how to present a defense. And he had problems on direct examination. He had problems on cross-examination. He was on the stand for over two hours. So even if the attorney just went over questions with him and did nothing else, that would have taken two hours to go over direct examination and potential questions on cross-examination. And lastly, I would just like to end on the fact that the government argued in their brief at 12 and at page 19 that there's nothing in the report that undermines the overwhelming evidence that he fabricated evidence and fabricated a story to counter evidence that would show knowledge. That an unknown individual created fraudulent documents in an attempt to provide Mr. Flores with a defense. And Dr. Yanofsky's report clearly states he didn't have the mental capacity to do that, that he was unable to have goal-directed complex behavior, and that given his intellectual resources, it was unlikely that he could devise a complex plan to traffic in drugs. Dr. Yanofsky's report goes to all of the areas of cross-examination that the government relied on to secure a conviction. Thank you, counsel. The case is submitted.
judges: Watford, Friedland, Motz